## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **BONNIE THAO,** an individual residing in the Town of Buxton, County of York, and State of Maine, both individually and as the parent and next friend of her four minor children (AT, MT, NT and ST),<br><br>**and**<br><br>**BLONG THAO,** an individual residing in the Town of Buxton, County of York, and State of Maine,<br><br>       **Plaintiffs,**<br><br>  **v.**<br><br>**LH HOUSING, LLC**, a single-member Maine Limited Liability Company,<br><br>**and**<br><br>**ERIC HOLSAPPLE,** the sole member of LH Housing, LLC and an individual residing in the State of Colorado,<br><br>       **Defendants.** | Case No. _____ |

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Bonnie and Blong Thao, individually and on behalf of their four minor children, by and through undersigned counsel, hereby complain against Defendants LH Housing, LLC and Eric Holsapple as follows:

1

## INTRODUCTION

1.    This diversity action alleges fraud, fraudulent transfers, unfair trade practices, breach of contract, conversion, breach of the implied warranty of habitability, wrongful eviction, negligence, and negligent misrepresentation on the part of Defendants, which caused Plaintiffs to suffer personal injuries related to mold exposure, homelessness, the loss of nearly all their personal belongings, and severe emotional distress.

2.    This action further alleges that Defendant LH Housing, LLC and its sole member, Defendant Eric Holsapple, are slumlords who prey on and profit from the exploitation of vulnerable individuals from whom they can extract large sums of rental income without delivering habitable, safe housing in exchange. Beyond Defendants' reputation for being slumlords, this lawsuit alleges that LH Housing and Eric Holsapple perpetrated an ongoing scheme to defraud individuals to whom they rented uninhabitable properties, as well as a broader real estate Ponzi or churning scheme to defraud homeowners using lease/sale back scams, from which Defendants profited greatly.

3.    Defendants LH Housing, LLC and Eric Holsapple are parties to a civil RICO Act conspiracy case filed in this Court, captioned *Douglas et al. v. Lalumiere et al.*, Case No. 2:20-cv-00227-JDL ("the *Douglas Litigation*"). The allegations of the First Amended Complaint in the *Douglas Litigation* (ECF No. 11) are specifically incorporated herein by reference. Those allegations reveal the existence of a corrupt racketeering enterprise by and between multiple entities owned by Scott Lalumiere

and his Colorado-based, former business partner Eric Holsapple. These corrupt entities and their members, including without limitation LH Housing, LLC, MECAP, LLC, and Milk Street Capital, profited from a Ponzi and/or churning scheme to defraud homeowners and renters by constantly flipping, mortgaging, and fraudulently transferring real estate, including both the distressed kind of property described in this case, and the more high-end real estate described in the *Douglas Litigation*.

## THE PARTIES

4.     Plaintiff Bonnie Thao ("Mrs. Thao") is an individual residing in the Town of Buxton, County of York, and State of Maine.

5.     Plaintiff Blong Thao ("Mr. Thao") is an individual residing in the Town of Buxton, County of York, and State of Maine.

6.     Mr. and Mrs. Thao (collectively, "Plaintiffs") are a married couple that live together with their four minor children. Mr. and Mrs. Thao are also the parents of Penelope Thao, who has recently reached the age of 18.

7.     Mrs. Thao brings this action individually and on behalf of her and Blong Thao's minor children. From oldest to youngest, the Thao's children are as follows: Penelope Thao (18), NT (16), ST (15), MT (13), and AT (10).

8.     Defendant LH Housing, LLC ("LH Housing") is a Maine limited liability company that formerly conducted business in the same location as MECAP and Milk Street Capital, 84 Middle Street in Portland, Maine.

9.  Defendant Eric Holsapple is the sole member of LH Housing, LLC, and he resides in the State of Colorado.

## JURISDICTION AND VENUE

10.  Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332, because Defendant LH Housing's sole LLC member, Eric Holsapple, is a resident of the State of Colorado, diversity of citizenship is determined as of the date of filing, and the matter in controversy exceeds $75,000.00.

11.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim arose in this judicial district.

## BACKGROUND FACTS

12.  On July 29, 2015, Plaintiffs signed a lease with LH Housing, LLC to rent a single-family home with an in-law apartment located at 188 Portland Avenue in Old Orchard Beach, Maine.

13.  The home located at 188 Portland Avenue in Old Orchard Beach, Maine was owned by LH Housing (hereinafter "the Portland Avenue property").

14.  When Plaintiffs first viewed the Portland Avenue property, they immediately noticed various broken windows, unsafe drug paraphernalia, trash, and other hazards. However, LH Housing's representative indicated the property would be thoroughly cleaned and repaired prior to the move in date.

15.     In July of 2015, Plaintiffs were transitioning out of public housing and were proud they had saved enough money, working multiple jobs between the two of them, to afford a rented home for their family that was not in public housing.

16.     In addition to broken windows, trash, and needles/drug paraphernalia in the backyard, the electrical wiring inside the Portland Avenue property was dangerous and not up to code.

17.      In violation of Maine law, the Portland Avenue property did not have operational smoke detectors or carbon monoxide monitors.

18.     Defendants charged Plaintiffs a monthly rent of $1,600.00 and allowed them to sublease an in-law apartment at the Portland Avenue property to another couple.

19.     Once Plaintiffs moved into the Portland Avenue property, they noticed that the carpet inside the home frequently felt damp, as did Plaintiffs' couch.

20.     None of the repairs that LH Housing promised had been completed by the time Plaintiffs moved into the Portland Avenue property.

21.     On or about Friday, August 28, 2015, Plaintiffs noticed that the toilets in the house were not flushing properly. Mr. and Mrs. Thao told LH Housing about the plumbing issue, believing the septic tank might be the source of the problem.

22.     At the time Plaintiffs reported this condition to LH Housing, which made the home unfit for human habitation, Plaintiffs were current on their rent payments.

23.     Defendants' property manager responded to the plumbing issue with very little concern, stating that he could not do anything until Monday.

24.     Over the weekend, raw sewage began backing up and spewing out of a pipe in the basement of the Portland Avenue property. Plaintiffs waited the entire weekend without running water or a functioning toilet.

25.     Defendants sent a maintenance man to the Portland Avenue property on Monday, who said he would need to "snake" the toilet, but he did not bring the "snake" with him.

26.     On or about September 2, 2015, Blow Brothers came to the Portland Avenue property to pump the septic tank.  The top interior layer of the septic tank was covered with tampon applicators and baby wipes.

27.     Defendants falsely accused Mrs. Thao of flushing tampons and/or baby wipes down the toilet in violation of Defendants' express instructions. Mrs. Thao responded that she could not possibly have been flushing feminine products down the toilet. For medical reasons, Mrs. Thao does not use or require these sanitary products. Furthermore, Plaintiffs were not flushing baby wipes down the toilet because their children were out of diapers.

28.     Blow Brothers told Plaintiffs that the problem causing the raw sewage to leak into the house was not due to the septic tank, but instead a clog in one of the pipes.

29.    Shortly thereafter, another plumber came to the Portland Avenue property. This plumber used a special cutting tool to purportedly repair the issue with the toilets.

30.    When the plumbers were finished with their work, they left an outrageous mess in Plaintiffs' house.  They put down a powdery substance to kill airborne bacteria and said they would be back the following day to clean up.

31.    Neither the plumbers nor anyone from LH Housing returned to the property to clean up the raw sewage.

32.    The toilets in the Portland Avenue property continued to malfunction. If Plaintiffs flushed the toilet, it would back up in the bathtub.  They had to stop using running water for days at the direction of Defendants.

33.    Every member of Plaintiffs' household became sick throughout this timeframe.  For over a month, multiple members of the family were vomiting and/or suffering from diarrhea.

34.    Two of Plaintiffs' children had fevers and one child needed to visit the emergency room due to dehydration and illness caused by raw sewage in the home.

35.    Plaintiffs threw a birthday party for their son NT in early October 2015.

36.    Prior to that date, LH Housing had asked Plaintiffs not to enter the basement of the Portland Avenue property because it was a "separate unit." However, a fuse blew during NT's birthday party and Mr. Thao had to go into the basement to find the fuse box.

37.    When Mr. Thao went into the basement, he discovered cat litter, tampons, feces, toilet paper and fluorescent-looking mold all over the floor. Raw sewage was spilling out from a pipe near the ceiling in the basement.

38.    The cat litter in the basement revealed that this was not the first sewage leak in the Portland Avenue property, but instead sewage had leaked before Plaintiffs moved in.

39.    Upon information and belief, LH Housing simply covered up the raw sewage with cat litter instead of cleaning it up or remediating the property.

40.    The Portland Avenue property was also infested with mice, mouse feces, and mouse urine. Throughout the day, mice could be heard frequently scurrying inside the walls.

41.    When Plaintiffs told LH Housing's property manager Sara McKee about the mice, she behaved in an extremely hostile and degrading manner toward Plaintiffs, starting harshly that: "Everyone has mice."

42.    However, the mouse infestation at the Portland Avenue property was beyond what any typical residential property in Maine would suffer.

43.    Throughout the fall of 2015, it became clear that the Portland Avenue property was overwhelmingly infested with mold. The carpet and furniture remained damp and Plaintiffs' belongings were covered with an almost glowing, yellow/green film of mold.

44.    As a result of the toxic mold growing throughout the Portland Avenue property, every member of Plaintiffs' family experienced some degree of mold-related

illness, including asthma and allergies, headaches, general fatigue, cold sweats, fevers, and more.

45.    Despite the horrible living conditions at the Portland Avenue property and their collective illnesses caused by those living conditions, Plaintiffs paid their rent for September 2015.

46.    On October 30, 2015, Mrs. Thao brought her children AT and ST to the doctor because of labored breathing, wheezing, and coughing. The doctor treated the children for asthma and related the exacerbation of their condition to environmental triggers.

47.    Mrs. Thao had to bring ST to the emergency room, where ST tested positive for a mold allergy.

48.    After being exposed to these environmental toxins, Mrs. Thao experienced allergic reactions to foods she had never been allergic to before. She also began experiencing gastrointestinal problems that, upon information and belief, were connected to the uninhabitable living conditions.

49.    Some members of Plaintiffs' family continue to have medical problems to this day due to mold exposure.

50.    LH Housing and Milk Street Capital's new property manager, Sara McKee ("McKee"), emailed Mrs. Thao on October 27, 2015, stating that she was "taking over property management for Christine" and wanted to meet at the Portland Avenue property.

51.     When McKee came to the Portland Avenue property, Mrs. Thao pointed out the brightly colored mold growing on furniture. In response, McKee wiped mold off the furniture with her hand and said: "you can clean that up."

52.     On behalf of LH Housing, McKee denied and dismissed the existence of raw sewage in the basement and claimed, "That's just irrigation water."

53.     Throughout their interactions, McKee bullied, belittled, and intimidated Plaintiffs, especially Mrs. Thao.

54.     A former neighbor said that the person who had lived at 188 Portland Avenue left running water in the basement, flowing through it "like a river" for years. Upon information and belief, the mold infestation existed long before Plaintiffs moved in, and LH Housing knew about it.

55.     McKee demanded rent for November, but by this time Plaintiffs refused to pay rent until the property was appropriately remediated.

56.     In response to this communication, McKee threatened Plaintiffs with eviction and told them, "You're nothing but squatters."

57.     In early November 2015, LH Housing finally sent a company (Octagon Cleaning) to clean the raw sewage and mold in the home, but Octagon Cleaning was not tasked with cleaning Plaintiffs' personal property.

58.     On November 3, 2015, Mrs. Thao emailed McKee as follows:

"I am writing to inform LH Housing that we will not accept your offer of housing us in one of your different properties. I am also writing you to obtain our security deposit back immediately. . . . The fact of the matter, is that LH Housing has breached their contract expecting a family to live in these conditions. I had to take my children to the doctor for this unsafe living situation. Also I need someone to come to the house with my husband or I to help us see what we can salvage. This is so devastating for our family, and we are at a huge loss. Christmas is next month, and we are now homeless and have lost everything. As a mother I feel helpless. Thank you for your time."

59.     Mrs. Thao suffers from mental health disabilities in the form of anxiety and PTSD.  When she would complain about issues with the house, LH Housing treated her like a "crazy" person, or like everything wrong with the house was her fault.

60.     For instance, the issue with broken windows was very upsetting to Mrs. Thao because she has a history of trauma and wanted to make sure that her family was safe in the home with windows that locked.  LH Housing ignored this concern and failed to take care of the broken windows.

61.     After months of Defendants' failure to remedy the uninhabitable living conditions in the Portland Avenue property, Plaintiffs contacted the Town of Old Orchard Beach's code enforcement officer ("CEO") about the condition of the home.

62.     When the CEO came out to the Portland Avenue property in late October of 2015, he immediately told Plaintiffs to grab a few belongings and get out of the house because he was condemning the property.

63.     The Thao children were forced to leave their books, toys, and stuffed animals behind because everything was covered with mold.

64.     Plaintiffs and their five children left the house with just the clothes on their backs and whatever possessions they could carry.

65.     The Thao family then became homeless; their youngest daughter was so traumatized by these events that she would pack a suitcase every night before going to bed because she did not know where they were going to sleep the next day.

66.     The Thao family had to rely on emergency, temporary housing and social work services for short-term shelter. They encountered multiple obstacles in finding another rental property given their circumstances. The Thao family suffered through months and/or years of housing instability, which has caused each member of the family severe emotional distress.

67.     LH Housing retaliated against Plaintiffs based on the above events by taking all of their personal property and literally throwing it, junkyard style, into a back room of the Portland Avenue property. That back room had water leaking into it, further exacerbating the mold damage to Plaintiffs' wood and fabric furniture, beds, and all of their other personal property.

68.     On Christmas Eve, December 24, 2015, LH Housing, by and through McKee, demanded to know when the Thao family would retrieve their personal belongings that were rotting in a water and mold infested room at the Portland Avenue property. At the time, however, the Thaos were homeless and could not afford to have their personal property cleaned or remediated. Defendants refused to assist the Thaos with cleaning or remediation.

12

69.     In January of 2016, Defendants threw Plaintiffs' personal property in the driveway under a tarp in the dead of winter.

70.     Defendant LH Housing, by and through McKee, continued to behave in a retaliatory manner toward Plaintiffs and their children by failing to respond to repeated inquiries about the status and location of their personal property.

71.     Eventually, LH Housing removed Plaintiffs' belongings from the house and wrongfully retained the property, this time throwing it into a storage unit.

72.     Plaintiffs' personal property was damaged by LH Housing throwing it into the back room of the Portland Avenue property and/or a storage unit. The personal property that was not broken nevertheless sustained damaged beyond repair because it was infested with mold and mildew.

73.     LH Housing paid for only $1,000 worth of Plaintiffs' clothing to be dry cleaned. For the remaining property, LH Housing demanded that Plaintiffs remove their belongings from the storage unit in an unreasonably short amount of time, considering that Plaintiffs were homeless.

74.     When Plaintiffs were unable to remove all of their personal property from the storage unit, LH Housing disposed of most items.

75.     Upon information and belief, LH Housing used some of the Thao family's personal property to furnish other run-down rental properties.

76.     As a result of the above events, Mrs. Thao had to seek treatment from her physician, who prescribed anti-anxiety medications for panic attacks and nightmares.

77.     In August of 2017, NT required eye surgery at Maine Eye Center in Portland. Due to his exposure to mold in the Portland Avenue property, his tear duct became clogged and closed off, causing his eye to constantly drain.

78.     Plaintiffs and their children have continued to experience adverse effects on their health to the present day as a result of LH Housing's outrageous conduct, from which malice can be implied.

79.     The housing instability caused by the above events have set the Thao family back financially and caused extreme hardship for years, despite Mr. and Mrs. Thao both working multiple jobs trying to regain what the family has lost.

## LH HOUSING'S PONZI/REAL ESTATE CHURNING SCHEME

80.     Long after becoming homeless and losing nearly all of their personal property, Plaintiffs learned that LH Housing was not only a negligent slumlord, but actively involved in a Ponzi or churning scheme to defraud other renters and homeowners in real estate scams.

81.     LH Housing is the primary orchestrator of a money laundering and fraudulent sale/lease back scam to make huge sums of money off people in financial distress.

82.     For instance, in the *Douglas Litigation*, Christina Davis ("Davis") submitted an affidavit describing the nature of the sale/lease back scam to which she felt victim.

83.    In 2005, Davis and her husband purchased their home located at 36 Settler Road in South Portland, Maine. *See* Exhibit B to First Amended Complaint in the *Douglas Litigation* at ¶ 1.

84.    In April of 2012, Davis conveyed the home to Skyline Real Estate Services, Inc., which upon information and belief was another sham entity formed by Lalumiere. *Id.* at ¶ 3-4.

85.    In conjunction with the sale of Davis's home, she entered into a residential lease with Lalumiere's sham company, which gave her an option to buy back the home for $140,000, with rent payments being credited toward the purchase price. *Id.* at ¶ 5-6.

86.    Shortly after this transaction occurred, in October of 2012, Lalumiere deeded the property to his wife, Melissa, who then deeded it back to him in 2018. *Id.* at ¶ 9-10. Lalumiere then mortgaged the property to further his fraudulent churning of real estate and pocket the proceeds of his fraud. *Id.* at ¶ 11-12. At this time, Lalumiere worked closely with Defendants LH Housing and Holsapple.

87.    The *Douglas Litigation* contains numerous other instances of similar sale/lease back transactions, which were designed to avoid disclosures under the Truth In Lending Act and the Real Estate Settlement Procedures Act.

88.    The *Douglas Litigation* accuses Defendants in the instant action of laundering over $1 million as a result of the real estate Ponzi/churning scheme described above.

89.    LH Housing, LLC was formed in 2012.

90.    In 2013, the members of LH Housing, LLC were Steve Matthews ("Matthews"), EJH Investments, LLC (with a Loveland, Colorado address, "EJH" likely stands for Eric J. Holsapple), Scott Lalumiere ("Lalumiere"), and Wayne Lewis ("Lewis").

91.    In 2014 and 2015, the members of LH Housing, LLC were Matthews, Holsapple, Lalumiere and Lewis.

92.    Lalumiere was the sole member of MECAP, LLC, which did business under the assumed name Milk Street Capital, at the same address as LH Housing, 84 Milk Street in Portland, Maine.

93.    Milk Street Capital and LH Housing both employed the above-described property manager, Sara McKee, who abused and mistreated Plaintiffs as part of her role in perpetuating Defendants' fraud.

94.    Lalumiere, with the help of Defendant Holsapple and others, purchased multiple distressed, run-down properties and deeded them to MECAP, LLC or LH Housing for no value.

95.    Upon information and belief, Holsapple is from Dexter, Maine but resides in Colorado.

96.    Lewis resides in Colorado.

97.    Upon information and belief, Holsapple and Lewis are engaged in fraudulent real estate transactions in Colorado as well as Maine. In Maine, Holsapple and Lewis worked with Mike Lynden, Shawn Lynden, and Russell Oakes ("Oakes"), as well as Lalumiere, in furtherance of the above fraudulent scheme. Upon

information and belief, Oakes was the purported "landlord" who initially showed Plaintiffs the Portland Avenue property.

98.     Plaintiff served a notice of claim on LH Housing, LLC and MECAP, LLC on or about January 6, 2016. The notice of claim advised of the accrual of prejudgment interest and also a claim against LH Housing under the Unfair Trade Practices Act, 5 M.R.S. § 213.

99.     After being put on notice of the claim in this case, LH Housing, LLC transferred or sold off multiple real estate holdings to another LLC called LH Acquisitions.

100.    In addition to the *Douglas Litigation*, MECAP/Milk Street, Lalumiere, and LH Acquisitions are defendants in a foreclosure action in this Court, captioned *CAF-REO-1, LLC v. LH Acquisitions, LLC, et al.*, 2:20-cv-00333-JDL ("the *Foreclosure Action*").

101.    In the *Foreclosure Action*, Lalumiere, LH Acquisitions, and LH Housing all failed to defend or appear, and each Defendant was defaulted.

102.    LH Housing, MECAP, and LH Acquisitions were engaged in a fraudulent enterprise and each entity abused its corporate form, engaging in fraudulent transfers of real estate for no value.

103.    LH Housing, MECAP and LH Acquisitions set up multiple empty shell companies in order to further their fraud and evade creditors.

104.    Upon information and belief, Holsapple and LH Housing, along with Lalumiere and MECAP, extensively comingled funds and assets in furtherance of their collective fraud.

105.    Upon information and belief, LH Housing is currently undercapitalized, if the entity has capital at all.

106.    Sufficient facts exist in this case to pierce the corporate veil and hold Eric Holsapple, the sole member of LH Housing, LLC, liable for the company's fraud and all of the claims asserted herein.

107.    The corporate veil of LH Housing, LLC must be pierced, and the assets of its sole member, Eric Holsapple, must be reached in order to avoid injustice to Plaintiffs.

## COUNT I – FRAUD

108.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 107 as if fully stated herein.

109.    Defendants made misrepresentations of material facts to Plaintiffs, for the express purpose of inducing Plaintiffs to rely on the statements of fact and sign a lease agreement to rent the Portland Avenue property.

110.    Defendants continued making misrepresentations of material facts to Plaintiffs up until the time they vacated the Portland Avenue property when it was condemned by code enforcement.

111.    Defendants made the foregoing misrepresentations with knowledge or reckless disregard for their truth or falsity.

112.    Plaintiffs relied on Defendants' misrepresentations of material facts to their detriment.

113.    Unbeknownst to Plaintiffs, Defendants were engaged in an entire fraudulent scheme intended to induce reliance on the part of renters and homeowners in financial distress, solely so Defendants could exploit and profit from them.

114.    As a result of Defendants' fraud, Plaintiffs have suffered extensive economic and consequential damages.

115.    Defendants' fraud, and all other conduct alleged herein, was undertaken with actual malice or such outrageously reckless conduct that malice can be implied, justifying an award of punitive damages.

WHEREFORE, Plaintiffs Bonnie and Blong Thao request that the Court award them damages for Defendants' fraud, including compensatory, economic, and punitive damages, attorney's fees, costs, and interest, and all other relief afforded to them by law.

## COUNT II – MAINE UNIFORM FRAUDULENT TRANSFER ACT
### (14 M.R.S. § 3571 *et seq.*)

116.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 115 as if fully stated herein.

117.    Defendants engaged in multiple instances of fraudulent transfers of real estate as set forth above.

118.    In transferring property back and forth between LH Housing, LH Acquisitions, and other individuals and corporate entities, Defendants received far less than reasonably equivalent value for the property transferred.

19

119.    Defendants have engaged in multiple fraudulent transfers to insiders within the meaning of the Maine Uniform Fraudulent Transfer Act. At this point, LH Housing owns very little property because Defendants have sold off or transferred property to other sham entities, including without limitation LH Acquisitions. Defendants have pursued these real estate transfers to launder money from their fraudulent enterprise and shield assets from creditors like Plaintiffs.

120.    As early as 2015, LH Housing was on notice of Plaintiffs' claims against the entity. LH Housing knew or reasonably should have known that Plaintiffs had asserted a claim against them, and that given the allegations of the *Douglas Litigation* and the *Foreclosure Action* discussed above, LH Housing would no longer be able to pay any claim against it.

121.    Defendants knew that Plaintiffs were creditors within the meaning of the Maine Uniform Fraudulent Transfers Act, and they knew that deeding property to LH Acquisitions for no value would result in LH Housing's insolvency.

122.    Upon information and belief, Defendant LH Housing, LLC has either reached or is close to the point of insolvency.

123.    Each of the aforementioned individuals and entities involved in the corrupt enterprise to defraud and profit from individuals in financial distress acted with the specific, actual intent to hinder, delay, or defraud creditors like Plaintiffs.

WHEREFORE, Plaintiffs seeks all damages to which they are entitled at law for Defendants' fraudulent transfers, including but not limited to the following:

A.    Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

B.    An attachment, trustee process or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by law; or

C.    Subject to applicable principles of equity and in accordance with applicable civil rules of procedure:

(1)    An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(2)    Appointment of a receiver to take charge of the asset transferred or of other property of the transferee;

(3)    Damages in an amount not to exceed double the value of the property transferred or concealed; or

(4)    Any other relief the circumstances may require, including punitive damages.

## COUNT III – MAINE UNFAIR TRADE PRACTICES ACT
### (5 M.R.S. § 207 *et seq.*)

124.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 123 as if fully stated herein.

125.    On or about January 6, 2016, Plaintiffs served a notice of claim for the accrual of prejudgment interest on Defendants, which included a notice and settlement demand under the Maine Unfair Trade Practices Act ("UTPA").

126.    Under the UTPA, "unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful."

127.    Plaintiffs leased the real property at 188 Portland Avenue in Old Orchard Beach, Maine for personal, family and household purposes.

128.    Defendants received rental income from Plaintiffs as a condition of the lease.

129.   The property located at 188 Portland Avenue in Old Orchard Beach, Maine was not leased to Plaintiffs in a condition that was suitable for human habitation.

130.   Plaintiffs suffered the loss of money and property as discussed above due to Defendants' unfair and deceptive acts and trade practices. The unfair and deceptive trade practices predated the lease signed by Plaintiffs, and they continued throughout Plaintiffs' tenancy, extending to the present because Defendants continue to engage in fraudulent transfers to shield assets from creditors like Plaintiffs.

131.   Plaintiffs have complied with the settlement demand procedures set forth in 5 M.R.S. § 213(1-A), and Defendants failed to tender a settlement offer or otherwise respond.

132.   Defendants' conduct alleged herein constituted multiple instances of unfair and deceptive trade practices and wrongful acts under the UTPA.

WHEREFORE, Plaintiffs Bonnie and Blong Thao request that the Court award them damages for Defendants' UTPA violation, including economic, compensatory, and punitive damages, attorney's fees, costs, and interest, and all other relief afforded to them by law.

## COUNT IV – BREACH OF CONTRACT

133.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 132 as if fully stated herein.

134.   Plaintiffs entered into a written lease agreement with Defendants that was adequately supported by consideration, with mutual assent to be bound.

22

135.   The lease between the parties obligated Plaintiffs to report to the landlord evidence of water leaks, excessive moisture, mildew, mold, as well as malfunctions in heating, ventilation, or air-conditioning.

136.   The lease requirement that tenants immediately report such serious conditions in the property constituted an implied covenant or obligation to address the enumerated conditions when they arose.

137.   Plaintiffs performed under the contract and notified Defendants when they encountered moisture, mold, sewage, and similar conditions in the house, and in fact notified them on multiple occasions.

138.   Defendants did not adequately address the water intrusion, mold, mouse infestation, or raw sewage throughout the Portland Avenue property, which made the premises uninhabitable under Maine law and the lease agreement.

139.   LH Housing breached the lease agreement beginning on August 31, 2015 and continuing until the time Plaintiffs were left with no choice but to vacate the condemned premises in late October 2015.

140.   Defendants' breach caused Plaintiffs to suffer damages, including economic and consequential damages.

WHEREFORE, Plaintiffs Bonnie and Blong Thao request that the Court award them economic, consequential, and punitive damages for Defendants' breach of contract, attorney's fees, costs, interest, equitable and injunctive relief, and all other relief afforded to them by law.

## COUNT V – CONVERSION

141.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 140 as if fully stated herein.

142.   Plaintiffs had sole and exclusive ownership of their personal property items, including every piece of clothing, toys, furniture, family memorabilia, electronics, and other personal effects that they owned, all of which was located at the Portland Avenue property.

143.   Plaintiffs had the exclusive right to possession of their personal property.

144.   As set forth above, and further in text messages and emails between the parties, Plaintiffs made numerous demands for proper storage, cleaning, safekeeping, and return of their personal property.

145.   As set forth above, and further in text messages and emails between the parties, Defendants wrongfully destroyed, retained, and/or withheld Plaintiffs' personal property despite demands to the contrary.

146.   Defendants refused to remediate, clean and/or return Plaintiffs' personal property without infestation of mold and mold spores, as well as rodent feces.

147.   Defendants intentionally stored Plaintiffs' personal property items in a manner that would guarantee all such property was entirely unusable and destroyed.

148.   Defendants intentionally converted Plaintiffs' personal property to their own use by moving the property in the home to a back room with water intrusion.

24

149.    Defendants wrongfully converted every piece of property that the entire Thao family owned, except for what Plaintiffs could carry out of the house when it was condemned in October of 2015.

150.    Plaintiffs incurred significant expenses and financial distress having to replace all items of personal property lost in the Portland Avenue property.

WHEREFORE, Plaintiffs Bonnie and Blong Thao request that the Court award them compensatory, economic, and punitive damages for the conversion of their property, damages they incurred in replacing the property, and all other relief afforded to them by law.

## COUNT VI – BREACH OF IMPLIED WARRANTY OF FITNESS FOR HUMAN HABITATION
### (14 M.R.S. § 6021)

151.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 150 as if fully stated herein.

152.    In any lease agreement under Maine law, including the lease between Plaintiffs and Defendants in this case, the landlord is deemed to have covenanted and warranted that the dwelling is fit for human habitation.

153.    Conditions arose in the Portland Avenue property that rendered it unfit for human habitation, including the presence of mold and mold spores, raw sewage spewing in the basement, bathtub, and toilets, occasional lack of running water, constant moisture and dampness, and rodent feces.

154.    These conditions endangered and materially impaired the health and/or safety of Plaintiffs.

155. These conditions surfaced early in Plaintiffs' tenancy, were not caused by Plaintiffs, and, upon information and belief, they predated Plaintiffs' tenancy.

156. Plaintiffs gave actual and repeated notice of the conditions to Defendants without delay.

157. Defendants unreasonably failed under the circumstances to take prompt, effective steps to remedy the outrageously toxic and uninhabitable conditions in the Portland Avenue property.

158. At the time notice was given, Plaintiffs were current on their rental payments.

159. Defendants' failure to repair or remedy any of these unsanitary, unhealthy, and dangerous conditions breached the warranty of fitness for human habitation.

160. As further evidence of the breach, the Portland Avenue property was condemned by the Old Orchard Beach Code Enforcement Officer ("CEO") as unfit for human habitation.

WHEREFORE, Plaintiffs ask the Court to enter judgment in their favor and against Defendants, and award actual damages for breach of the implied warranty of fitness for human habitation, punitive damages, attorney's fees, costs, injunctive relief, and such other and further relief afforded to them by law.

## COUNT VII – WRONGFUL EVICTION

161. Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 160 as if fully stated herein.

162.   As a result of Defendants' wrongful acts described above, Plaintiffs were forced to vacate the condemned Portland Avenue property and became homeless.

163.   Prior to the property being condemned, Defendants attempted to force Plaintiffs to sign a termination of lease in retaliation for Plaintiffs' complaints of uninhabitable living conditions.

164.   Defendants retaliated against Plaintiffs for complaining to the Old Orchard Beach CEO about the Portland Avenue property, in violation of 14 M.R.S. § 6001.

165.   Defendant constructively evicted Plaintiffs from their home in violation of 14 M.R.S. § 6014(1)(B).

166.   Plaintiffs were denied access to their personal property in violation of 14 M.R.S. § 6014(1)(C). Once granted access after many months, Plaintiffs discovered their property had been further damaged in the mold and sewage. Plaintiffs also learned of their property being moved to other rental units owned by Defendant.

167.   Because of the unfit, toxic, and dangerous condition of the home, Plaintiffs did not have access to hot water, clean water, or a toilet for an extended period of time. Raw sewage spewed into the house and from the sinks, bathtub, and toilets. Defendants directed Plaintiffs not to use the water or the toilets. This was a violation of Plaintiffs' rights under 14 M.R.S. § 6014(1)(A).

WHEREFORE, Plaintiffs Bonnie and Blong Thao request that the Court award them statutory, compensatory, and punitive damages for wrongful eviction, attorney's fees, costs, interest, and all other relief afforded to them by law.

## COUNT VIII – NEGLIGENCE

168.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 167 as if fully stated herein.

169.    As Plaintiffs' landlord, Defendants owed them a duty of reasonable care to provide a living space that was safe and free of undisclosed hazards.

170.    Defendants owed Plaintiffs a duty to maintain the Portland Avenue property in reasonably good condition.

171.    Defendants expressly agreed to maintain the premises in good repair, but breached that duty owed to Plaintiffs.

172.    Defendants gratuitously undertook to make repairs to the Portland Avenue property but did so negligently.

173.    Defendants negligently failed to disclose the existence of latent defects in the Portland Avenue property, including not only mold and water intrusion, but the existence of raw sewage and plumbing problems that caused human health problems for Plaintiffs.

174.    Defendants also assumed a duty of care to take reasonable steps to ensure Plaintiffs' personal property was not further damaged in storage or while the house was condemned by the CEO.

175.    For all of the reasons stated herein, Defendants breached the multiple duties of care owed to Plaintiffs.

176.    Defendants' breach of the multiple duties of care owed to Plaintiffs proximately caused Plaintiffs to suffer personal injuries, medical expenses, pain and

suffering, severe emotional distress, loss of personal belongings, loss of consortium, lost wages and lost earning capacity, homelessness, and other harm.

WHEREFORE, Plaintiffs Bonnie and Blong Thao request that the Court award them compensatory damages for medical expenses, property loss, pain and suffering, emotional distress, economic damages, punitive damages, and all other relief afforded to them by law.

## COUNT IX – NEGLIGENT MISREPRESENTATION

177.   Plaintiffs repeat the allegations contained in Paragraphs 1 through 176 as if fully stated herein.

178.   In the course of conducting its business, and in transactions where Defendants had a pecuniary interest, Defendants supplied false and misleading information to Plaintiffs for their guidance in determining whether to lease the rental property at issue in this case.

179.   Defendants falsely represented that the property was fit for human habitation and falsely misrepresented to Plaintiffs that hazards at the Portland Avenue property would be cleaned up or removed prior to the move in date.

180.   Defendants continued to make false and misleading representations of fact to Plaintiffs throughout their tenancy in the Portland Avenue property, and after the home was condemned as well, regarding repairs to the premises and storage of Plaintiffs' personal belongings.

181.   Defendants failed to exercise reasonable care or competence in obtaining or communicating the above information to Plaintiffs.

182.   Plaintiffs justifiably relied on Defendants' misrepresentations in determining whether to rent the property and whether it was safe for the Thao family to stay in the property.

183.   Defendants' misrepresentations caused Plaintiffs to suffer serious harm and personal injuries, as set forth above.

WHEREFORE, Plaintiffs Bonnie and Blong Thao request that the Court award them compensatory, economic, and punitive damages, and all other relief afforded to them by law.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Dated: August 24, 2021

*/s/ Laura H. White*

_____
Laura H. White, Bar No. 4025
*Attorney for Plaintiffs*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
lwhite@whiteandquinlan.com


*/s/ Danielle Quinlan*

_____
Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiffs*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
dquinlan@whiteandquinlan.com

30